UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 5:15-cr-55 |
| | ) | |
| ROBERT FITZGERALD | ) | |

**ORDER ON MOTIONS IN LIMINE**
(Docs. 47, 52, 54)

Defendant Robert Fitzgerald is charged with a single count of making a threat to assault a government official in violation of 18 U.S.C. § 115(b). The Indictment charges Fitzgerald with threatening a Veteran's Administration (VA) physician (Dr. Hematillake) on April 14, 2015. (Doc. 11.) Fitzgerald took issue with a decision by Dr. Hematillake to withhold approval of payment for a medical procedure offered by a physician outside of the VA system.

A jury trial is scheduled for March 28 through April 1, 2016. Currently pending are two motions in limine filed by Fitzgerald (Docs. 47, 52), and a renewed motion in limine filed by the Government (Doc. 54). In his motions in limine (Docs. 47, 52), Fitzgerald seeks to exclude presentation of evidence provided by the Government in discovery or referenced in the Government's trial memorandum (Doc. 46). In its renewed motion in limine (Doc. 54), the Government seeks admission of prior-act evidence in light of the court's proposed jury instructions and Fitzgerald's proffered defense. The court heard argument on the issues raised in those motions at a pretrial conference on March 21, 2016.

## Discussion

### I.   Evidentiary Standards

Under the Federal Rules of Evidence, the court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Under Rule 404(a), generally, "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Under Rule 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, that evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

### II.   Government's Evidence

The court begins with a brief summary of the events that the Government seeks to present. The description of the events is drawn primarily from the Government's trial memorandum (Doc. 46). The Government's evidence is divided into two categories: "background" evidence and "direct" evidence.

#### A.   Background Evidence

In summer 1979, while in the U.S. Army, Fitzgerald took leave without obtaining his commander's signature on a request for leave. In January 1980, he surrendered to local police and was returned to the Army by military police. In an effort at a joint resolution, the Army agreed to forego a court martial proceeding, and Fitzgerald pleaded guilty to a lesser charge, resulting in an agreed-upon Other Than Honorable (OTH) discharge. Fitzgerald acknowledged

his understanding that as a result of the OTH discharge, he risked deprivation of many or all VA benefits. Fitzgerald was discharged from the Army on March 12, 1980.

Fitzgerald has a history of applications for VA and other benefits. On July 7, 1980, he applied for VA benefits, including disability benefits and unemployment compensation. The VA denied the application on December 4, 1981, with a possible exception for health care coverage for any disability determined to be service-connected. On May 5, 1982, Fitzgerald applied to the Army for a discharge review and upgrade in discharge type. That application was denied on August 9, 1982. On July 9, 1985, Fitzgerald petitioned the VA to reconsider the character of his OTH discharge. On August 29, 1985, the VA concluded that Fitzgerald's OTH discharge was proper and constituted a bar to VA benefits except for healthcare for service-related disabilities.

On August 11, 1994, Fitzgerald filed for Social Security Disability Insurance. His application was denied on August 31, 1994, and then again upon reconsideration. On August 8, 1996, a Social Security Administrative Law Judge determined that Fitzgerald was disabled due to fibromyalgia as of August 1994.

In 2001, Fitzgerald filed claims with the VA for compensation for fibromyalgia, irritable bowel syndrome, sleep apnea, and a heart condition. Those claims were denied. On January 10, 2002, the VA determined that Fitzgerald's degenerative disc disease and fibromyalgia are service-connected but non-compensable. On June 13, 2002, Fitzgerald filed a Notice of Disagreement with the finding that his compensation for fibromyalgia is "for treatment purposes only." Following a hearing at which he testified, he failed to file a timely appeal and his appeal was denied as untimely on September 9, 2004.

3

According to Fitzgerald, a medical resident damaged his sciatic nerve during a 2002 myelogram procedure.[1] On December 17, 2003, the VA denied Fitzgerald's claim for compensation and determined that any purported damage due to the myelogram is not service-connected. On March 1, 2005, the VA denied Fitzgerald's claim for compensation for service-connected degenerative disc disease of the cervical spine, reasoning that he is service-connected for treatment purposes only due to his OTH discharge. The VA further denied Fitzgerald's claim for pension benefits, finding that he does not have any qualifying service for the benefit. On October 27, 2006, the VA denied Fitzgerald's renewed claim for compensation due to purported damage from the myelogram.

The Government seeks to introduce the testimony of Fitzgerald's primary care physician, Dr. Lynn Webster, to show that, during her treatment of him, Fitzgerald "demonstrated interest mainly in continuing to receive the large doses of opiods to which he had become accustomed." (Doc. 46 at 5.) The Government also seeks to introduce testimony from Dr. Webster that, after Fitzgerald was referred to an opiod pain clinic to wean him off the painkillers, he "chronically canceled or failed to appear," and was "obnoxious to the staff and generally difficult to deal with." (*Id.*)

B. **Direct Evidence**

The Government seeks to call Resident Agent in Charge (RAC) Donna Neves of the Office of Inspector General, Department of Veterans Affairs, to give "an overview of the investigation of the defendant and the April 16, 2015 arrest of the defendant." (*Id.* at 6.) The Government says it may also introduce Fitzgerald's "post-arrest statement to RAC Neves and VA Police Chief John Richardson." (*Id.*) Fitzgerald points out that the post-arrest statement

---

[1] A myelogram is a "[r]adiographic contrast study of the spinal subarachnoid space and its contents." *Stedman's Medical Dictionary* 582740 (28th ed. 2006) (Westlaw).

4

includes his statements regarding his AWOL status and his OTH discharge, his statement that he expected the state police to arrive at his house, and statements regarding his attitude towards foreigners. (*See* Doc. 52 at 5.) In his post-arrest statement, he also remarked that he wished he had put his truck at the bottom of his driveway so that the officers who had come to arrest him would have had to walk up the driveway and get their feet muddy. (*See* Doc. 52-1 at 5.)

The Government also seeks to introduce testimony from Dr. Hematillake that, as a result of Fitzgerald's threats, he purchased a handgun for protection. (Doc. 46 at 11.)

The Government seeks to introduce five instances of threats allegedly made by Fitzgerald before April 14, 2015. (*See* Doc. 54 at 3–4.) First, in a September 17, 2014 call to Dr. Burnside, Fitzgerald threatened to destroy the VA Medical Center in White River Junction, Vermont. Second, on February 18, 2015, Fitzgerald left voicemail messages for Dr. Webster threatening the radiology staff. Third, Fitzgerald left messages for radiology staff on February 23, 2015 where he threatened to "take a bullet and use it on somebody or myself" if he did not get an MRI right away. (*Id.* at 3.) Fourth, on February 26, 2015, Fitzgerald left voicemail messages for Jennifer Woodward of the Vermont League of Cities and Towns in which he threatened her and a truck driver purportedly responsible for cracking his windshield. He stated to Woodward that "you can go call your cops or whatever you wanna fucking do." (*Id.* at 4.) Finally, on February 26, 2015, Fitzgerald left a message for Mark Patten of the former Patten Oil company threatening vengeance because Patten had "crossed the line." (*Id.*) Each of those five incidents prompted a police response.

III.   **Analysis of Government's "Background" and "Direct" Evidence**

   1. **AWOL and other than honorable discharge—late 1970s–1980**

   EXCLUDED.  These events took place too long ago to have any reasonable evidentiary value.  In addition, the prejudicial impact of the AWOL episode followed by a less than honorable discharge greatly exceeds the probative value of these events.

   2. **History of applications for VA benefits and reevaluation of discharge—1980; 1982; 1985**

   EXCLUDED.  For reasons similar to (1) above, the defendant's efforts to obtain VA disability and health benefits some 35 years ago has little or no bearing on the events of April 14, 2015.

   3. **1994 Social Security claim**

   EXCLUDED.  There is no relevancy at all to the defendant's successful claim for social security disability payments.

   4. **2001 "application for compensation"**

   EXCLUDED.   This is another claim for disability benefits from the VA.  It has little or no evidentiary value in this case.  It is also unfairly prejudicial because it suggests that the defendant is a persistent applicant for benefits.  Anyone is entitled to apply for benefits without critical comment.

   5. **2002 "Notice of Disagreement" regarding denial of compensation**

   EXCLUDED.  This is an appeal from (4).

6. **2003 denial of compensation**

EXCLUDED. This is an administrative claim for compensation based on allegations that the defendant sustained injury in a myelogram at a VA facility. It has no relevance to the dispute over the spinal surgery which gave rise to the events of April 2015.

7. **December 2003 denial of compensation and pension**

EXCLUDED. This is another aspect of the administrative claim of iatrogenic injury.

8. **October 2006 denial of compensation claim**

EXCLUDED. This is another aspect of the administrative claim in (6) and (7). The entire matter of the alleged injury through the myelogram is irrelevant to the defendant's conduct some nine years later in connection with the proposed laser surgery.

9. **Drug-seeking behavior and "general attitude towards treatment and staff"**

EXCLUDED. This is improper "character evidence."

10. **RAC Neves and Chief John Richardson's testimony**

ADMISSIBLE, subject to the normal limits that the testimony concern actual observations relevant to the issues in the case. These witnesses are not coming to testify about whether the defendant was dangerous or obnoxious in his dealings with VA staff.

11. **Post-arrest statement to Neves and Richardson in April 2015 concerning:**

a. **AWOL status and OTH discharge**

EXCLUDED.

b. **Defendant expected police involvement**

EXCLUDED with respect to other incidents. ADMISSIBLE with respect to defendant's awareness that he was causing the recipients of his statements to fear harm and therefore contact law enforcement.

7

### c. Attitude towards foreign-born people

ADMISSIBLE to prove that Dr. Hematillake, who was born in Sri Lanka, was the subject of defendant's statements on April 14, 2015.

### 12. Dr. Hematillake's decision to purchase a handgun

EXCLUDED. The doctor's personal decision the day after April 14, 2015 to purchase a handgun to defend himself and his family is of very limited relevance. At the same time it injects into this case highly volatile and irrelevant issues concerning self-defense through lethal measures, the right to bear arms, and whether the defendant might invade Dr. Hematillake's home or assault him. None of these issues bear on the objective "true threat" determination or the required motive of retaliation. Dr. Hematillake is not a stand-in for a "reasonable person." His strong reaction to these events coupled with the Government's offer of proof concerning his normally peaceable Buddhist faith is likely to overshadow a more objective discussion by jurors of whether a reasonable person would view the alleged threat as presenting a real risk of physical harm.

### 13. "Muddy driveway" statement

EXCLUDED by agreement.

### 14. Other alleged threats in 2014-2015 to VA employees, excluding April 14, 2015

ADMITTED with the exception of the Patten Oil Co. statement. These statements, all coming close in time to the events of April 14, 2015, tend to demonstrate that the defendant was aware that his conduct was viewed as threatening by others and therefore the statements—and the response to them by law enforcement and VA staff—tend to show that defendant's purpose in making the statements on April 14, 2015 was to cause Dr. Hematillake the same fear and concern which prior statements had aroused in others. These statements are admissible under

Rule 404 as tending to show the defendant's knowledge and intent that his statements on April 14, 2015 would be taken seriously by others as harmful threats. This is an element of the Government's proof under *Elonis v. United States*, 135 S. Ct. 2001 (2015). The statements and the response they engendered also tend to prove that the April 14, 2005 statements were retaliatory since defendant learned through the prior incidents that he was causing alarm and concern in the recipients of his threats.

15. **April 14, 2015 statements**

**Which is the threat as charged?**

**What to tell the jury about this issue?**

The court will rewrite the jury instructions to provide that in order to return a guilty verdict, they must find unanimously that defendant communicated one of the statements on April 14, 2015, describing future harm to Dr. Hemitallake purposefully, with awareness that it would be received as a threat, and for the motive of retaliation against Dr. Hematillake.

IV.   **Defense Evidence**

The defense seeks to introduce evidence regarding the surgery that was ultimately performed on Fitzgerald at the Dartmouth-Hitchcock Medical Center (DHMC) on January 4, 2016 to address his cervical radiculopathy.[2] The defense would introduce evidence that the surgery revealed severe foraminal stenosis that would have caused significant pain; that the surgery was worthwhile; and that Fitzgerald is responding well to the surgery. (*See* Doc. 52 at 8.)

---

[2] Radiculopathy is a disorder of the spinal nerve roots. *Stedman's Medical Dictionary* 748650 (28th ed. 2006) (Westlaw).

9

**1. Testimony from DMHC physicians concerning the subsequent operation as well as the defendant's pain on April 14, 2015**

ADMISSIBLE for the limited purpose of demonstrating that the defendant uttered the alleged threats for the purpose of persuading Dr. Hematillake to authorize the laser surgery procedure in Florida which defendant was seeking, and not for the purpose of retaliating against the doctor for his decision to deny VA authorization for the procedure. The defense theory is that the defendant was in so much pain in April 2015 that he was willing to make extreme statements in order to persuade Dr. Hematillake to grant his request. The subsequent surgery is offered to demonstrate that his spinal problem was serious and would cause pain. Since the case is charged as one of "retaliation," evidence of a different motive such as influencing Dr. Hematillake's decision-making is admissible.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 23rd day of March, 2016.

_____
Geoffrey W. Crawford, Judge
United States District Court